**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DUAL-TEMP OF ILLINOIS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 09-cv-595 |
| | ) | |
| HENCH CONTROL CORPORATION, | ) | Judge Robert M. Dow, Jr. |
| HENCH CONTROL, INC., CAESAR-VERONA, | ) | |
| INC., JOHN HENCH, and ALEX DANEMAN, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

On September 28, 2009, the Court issued a memorandum opinion and order [78] denying

Defendant John Hench's motion to dismiss [18]. This order addresses motions filed by three of

the other defendants in this case—Hench Control, Inc.; Caesar-Verona, Inc.; and Alex Daneman.

(The fifth defendant, Hench Control Corporation, already has answered the complaint.) The

Court has subject-matter jurisdiction based on diversity of citizenship. 28 U.S.C. § 1332.[1]

Before the Court are motions to dismiss and accompanying memoranda of law filed by

Caesar-Verona, Inc. [46, 48]; Hench Control, Inc. [52, 54]; and Alex Daneman [49, 51]. Each

motion challenges the Court's personal jurisdiction pursuant to Federal Rule of Civil Procedure

12(b)(2) and the legal adequacy of Plaintiff's complaint pursuant to Rule 12(b)(6). For the

reasons stated below, the motions by Caesar-Verona, Inc. [46] and Hench Control, Inc. [52] are

---

[1] The Court notes that the Complaint alleges that John Hench is a California resident and Alex Daneman is a Washington resident. However, diversity of citizenship is based on citizenship rather than residency. *Meyerson v. Harrah's East Chicago Casino*, 299 F.3d 616, 617 (7th Cir. 2002) ("[R]esidence and citizenship are not synonyms."). The parties should come prepared to address the citizenship of Hench and Daneman at the Court's next status hearing.

denied. Alex Daneman's motion to dismiss [49] is granted, as the Court lacks personal jurisdiction over him.

## I.     Background[2]

Plaintiff, Dual-Temp of Illinois, Inc. filed a six-count complaint against Defendants Hench Control Corporation ("Hench Control I"), Hench Control, Inc. ("Hench Control II"), Caesar-Verona, Inc. ("Caesar"), John Hench ("John Hench"), and Alex Daneman ("Daneman") alleging violations of state contract and tort law.

Plaintiff operates a business that constructs, services, supplies, modifies, and repairs low temperature industrial refrigeration systems. Compl. ¶ 9. The Milord Company ("Milord") is a general contractor. In 2006, Milord contacted Plaintiff in connection with a bid for a job at Home Run Inn's pizza manufacturing plant. *Id.* ¶ 10. The job involved modifying and installing a sophisticated refrigeration system at Home Run Inn's manufacturing plant. The anticipated refrigeration control system was meant to regulate the various phases of cooling and freezing pizza, and it was to sound alarms should the cooling go awry. *Id.* Plaintiff does refrigeration but does not do control systems, so when it bid on the Home Run Inn job, it sought out John Hench (then-president of Hench Control I) to provide a bid to act as a sub-subcontractor on the contract. *Id.* ¶¶ 7, 11. Hench Control I claimed to specialize in refrigeration control work. *Id.* After representatives of Hench Control I, including John Hench, travelled to Chicago and examined Home Run Inn's processing plant, Hench Control I submitted a proposal for a control system for

---

[2] For purposes of Defendants' motions to dismiss, the Court assumes as true all well-pleaded allegations set forth in the complaint. See, *e.g.*, *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). While the Background section of this opinion is based on the complaint and cabins the Court's analysis of the Rule 12(b)(6) motions, additional materials and facts will be considered in Parts III.A.1 and III.B (analyzing the Rule 12(b)(2) jurisdictional challenges). See *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782-83 (7th Cir. 2003).

the Home Run Inn project. *Id.* ¶¶ 12, 13. Plaintiff then submitted its subcontractor bid, including the Hench Control I component, to Milord. *Id.* ¶ 14.

On or about October 20, 2006, Plaintiff was advised that it had been awarded the Home Run Inn job. Compl. ¶ 15. Plaintiff and Milord entered into a formal subcontract on November 6, 2006. *Id.* Pursuant to this contract, Plaintiff was to provide a refrigeration control system that operated to Home Run Inn's specifications. *Id.* To that end, Plaintiff issued a purchase order to Hench Control I for the work set forth in their refrigeration control system proposal. *Id.* ¶ 16. The amount of the purchase order was $45,078. *Id.* The purchase order required Hench Control I to comply with the requirements and be bound by the terms of the contract between Plaintiff and Milord. *Id.* ¶ 17.

Hench Control I accepted Plaintiff's purchase order and issued an invoice requesting 40% down payment of the purchase price, an amount that totaled $18,031. Compl. ¶ 18. Plaintiff issued Hench Control I a check in that amount in December 2006. *Id.* ¶ 20.

In January 2007, Hench Control I issued a second invoice requesting 50% of the purchase price, an amount that totaled $22,539. Compl. ¶ 21. During March 2007, without notice to Plaintiff, Hench Control I was acquired by Caesar (possibly in an asset sale). *Id.* ¶¶ 22, 27. John Hench stayed on as Chief Technical Officer and Alex Daneman became Chief Executive Officer. *Id.* ¶ 22. Hench Control I transferred its sub-subcontract to a new entity, Hench Control II. *Id.* ¶ 23. Plaintiffs were not notified of the transfer. *Id.*

By the end of March 2007, a control panel board was delivered to Plaintiff for the Home Run Inn project. Compl. ¶ 24. Plaintiff contacted Spur Electric, Inc., an electrical subcontractor, to attach the control panel board to the refrigeration system. *Id.* On that same day, Plaintiff issued Hench Control I a check in the amount of $22,539—the amount of the second invoice. *Id.*

¶ 25. Also, around the same date, without notice to Plaintiff, Hench Control I allowed its insurance policy (which named Plaintiff as an additional insured, per the agreement between Plaintiff and Hench Control I) to lapse. *Id.* ¶ 26. Neither Caesar nor Hench Control II provided Plaintiff with a replacement or continuation certificate of insurance. *Id.*

In June 2007, Milord notified Plaintiff that the control system did not operate according to Home Run Inn's requirements and that Home Run Inn would not accept the control system, nor would it approve final payment to be made to Milord and Plaintiff. Compl. ¶ 29. Plaintiff notified Hench Control I about the control system and requested that it take the necessary action under the purchase order to make the control system operate as Home Run Inn required. *Id.* ¶ 30. On or about July 5, 2007, Plaintiff received an invoice from Hench Control II requesting the final payment for the control system. *Id.* ¶ 31.

In July 2007, John Hench visited Home Run Inn in Chicago and made an inspection of the control system, but was unable to cure the defects. Compl. ¶ 33. Shortly after this visit, John Hench was no longer available to Plaintiff for consultation and Plaintiff believed that John Hench was no longer employed by Hench Control II. *Id.* On or about July 9, 2007, without notice to Plaintiff, John Hench dissolved Hench Control I. *Id.* ¶ 32.

Between June and December in 2007, the control system failed to operate, which caused daily shut downs of the refrigeration system at Home Run Inn's plant. Compl. ¶ 34. During that time, Plaintiff and Spur, its electrical subcontractor, provided its own personnel to monitor the control system to prevent a shut down and to attempt to determine the cause of the failure. *Id.* Hench Control II also provided telephonic support, onsite inspection, and numerous replacement parts during this time period. *Id.* ¶ 35. Despite all of this effort, the control system did not operate continuously. *Id.*

In December 2007, Hench Control II sent an engineer to investigate the control system at Home Run Inn's plant. Compl. ¶ 36. After investigation, the engineer concluded that Plaintiff failed to replace a defective humidi-stat, and that the failure caused the control system malfunction. *Id*. Plaintiff then replaced the humidi-stat and had Spur rewire the control system in accordance with the instructions provided by Hench Control II. *Id*. ¶ 37. However, the control system continued to malfunction even after this part was replaced. *Id*. Plaintiff and Spur continued to make service calls to the Home Run Inn plant to monitor the control system in order to keep the plant in production and avoid discontinuation of production operations and substantial loss of product. *Id*. ¶ 38. Additionally, Plaintiff continued to demand that Hench Control I and/or Hench Control II correct the malfunction in the control system. *Id*. ¶¶ 38, 40. Neither company cured this malfunction. *Id*. ¶¶ 38, 40.

Hench Control II issued an invoice to Plaintiff in the amount of $52,826.14 for the final balance due on the invoice and charges for remedial work. Compl. ¶ 39. Additionally, Hench Control II refused to perform any further work on the control system until it was paid in full. *Id*. Between December 2007 and June 2008, Daneman, CEO of Caesar (who also represented himself as the CEO of Hench Control II) sent correspondence to Home Run Inn and Milord stating that Plaintiff's faulty work was the reason for the failure in the control system. *Id*. ¶ 40. Daneman also complained that Hench Control II had fully performed under the agreement and that Plaintiff nonetheless refused to pay. *Id*.

In January 2008, Daneman wrote directly to Milord and Home Run Inn stating that the control system was performing as expected, suggesting that any failures were due to Plaintiff's faulty work, and listing a balance as to which Plaintiff was in arrears. Compl. ¶ 41. Milord forwarded a copy of this letter to Plaintiff. *Id*. Also, on the same date as Daneman's letter,

Milord's project manager responded to the claim that the performance issues were Plaintiff's fault by pointing to Hench Control II's technician's awareness of the defective device and failure to alert anyone to the problem for more than six months. *Id.* ¶ 42.

After receiving a copy of Daneman's letter, Plaintiff began to conduct an investigation into Hench Control I's corporate status. Compl. ¶ 43. During the investigation, Plaintiff discovered that Hench Control I had changed its name and, subsequently, dissolved. *Id.* Further investigation disclosed that Hench Control I had been sold to Caesar and was now being operated by Daneman as Hench Control II. *Id.* Plaintiff had been dealing with Hench Control II since March 2007, but that company was not incorporated until January 28, 2008. *Id.*

On or about April 2, 2008, Plaintiff issued letters to Hench Control I and Hench Control II demanding that both companies, including successors, beneficiaries, and designees, make the necessary repairs to the control system at Home Run Inn's plant in Chicago, Illinois. Compl. ¶ 44. Neither company responded to or complied with Plaintiff's demand. *Id.* ¶ 45. On April 29, 2008, Home Run Inn made demand upon Milord, who made demand upon Plaintiff, to remove the control system by Hench Control I and replace it with a functioning control system. *Id.* ¶ 46.

In May 2008, Plaintiff hired Select Technologies, Inc. to remove the malfunctioning control system and to design and install a new control system for Home Run Inn's plant. Compl. ¶ 47. In August 2008, Select Technologies, Inc. completed this work and, as a result, Plaintiff paid it $123,200 for the work performed. *Id.* ¶ 48. This new control system is operating as specified by Home Run Inn. *Id.*

According to Plaintiff, it has performed all of its obligations pursuant to the agreement that it entered into with Hench Control I; although Hench Control I and Hench Control II were paid by Plaintiff, they have not fulfilled their contractual allegations. Compl. ¶¶ 49, 50.

Count I of the complaint alleges that Hench Control I breached its contract with Plaintiff. Count II alleges breach of contract against Hench Control II. Count III alleges breach of contract against Caesar, the corporation that purchased Hench Control I (the latter of which became Hench Control II). Count IV alleges breach of contract against Alex Daneman, who Plaintiff says in effect was operating a sole proprietorship since Hench Control II was, for a time at least, an unincorporated entity. The other two counts are not targeted by the motions before the Court—Count V, which names Defendant John Hench and which withstood a motion to dismiss [78] and Count VI, which Plaintiff voluntarily dismissed [see 74, 75].

## II.    Legal Standards

### A.    Personal Jurisdiction

Personal jurisdiction "represents a restriction on judicial power * * * as a matter of individual liberty." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (quoting *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982)). It is a nearly ancient and "essential element of the jurisdiction of a district court," and without it the Court lacks power to resolve a case. *Employers Reinsurance Corp. v. Bryant*, 299 U.S. 374, 382 (1937) (essential element); *Burnham v. Superior Ct. of California, County of Marin*, 495 U.S. 604, 608-09 (1990) (plurality opinion) (observing that the implementation of the phrase *coram non judice* in American case law predated the Fourteenth Amendment). Once a defendant challenges personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), a plaintiff bears the burden of establishing personal jurisdiction. Where, as here, the district court decides the issue on the basis of written submissions, the plaintiff must establish a *prima facie* case of personal jurisdiction. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782-83 (7th Cir. 2003). Although conflicts between the parties' submissions are resolved in favor of the

plaintiff, "once the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Id.* at 783.

Where, as here, a court's subject-matter jurisdiction is based on diversity of citizenship, the court may exercise personal jurisdiction over a defendant only if personal jurisdiction would be proper in an Illinois court. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). The Illinois long-arm statute (735 ILCS 5/2-209(c)) streamlines the analysis because it allows Illinois courts to exercise personal jurisdiction up to the limits of the United States Constitution. *Id.* at 714-15.

The Fourteenth Amendment's Due Process Clause demands that before an out-of-state defendant may be required to defend a case in a forum state, it must have "minimum contacts" with the state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463 (1940)). "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). This "purposeful availment" standard ensures that a nonresident defendant will not be forced to litigate in a jurisdiction as a result of random contacts with the forum or the unilateral activity of the plaintiff. *Burger King v. Rudzewicz*, 471 U.S. 462, 474-75 (1985). The Supreme Court's case law teaches that

> the determination of the reasonableness of the exercise of jurisdiction in each case will depend on an evaluation of several factors. A court must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief. It must also weigh in its determination "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and

the shared interest of the several States in furthering fundamental substantive social policies."

*Asahi Metal Indus. Co., Ltd. v. Superior Ct. of California, Solano County*, 480 U.S. 102, 113 (1987) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)). The case law also describes the arc of the law in this realm: the standards related to personal jurisdiction generally have been relaxed due to modernization of communications and transportation, as well as the "increasing nationalization of commerce." *World-Wide Volkswagen*, 444 U.S. at 293 (citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 222-23 (1957)).

There are two bases for establishing personal jurisdiction: general and specific. *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414-16 (1984); see also *Hyatt Int'l*, 302 F.3d at 713. General jurisdiction exists when the defendant has "continuous and systematic" contacts with the forum state. *Helicopteros*, 466 U.S. at 416; *Hyatt Int'l*, 302 F.3d at 713. If such contacts exist, "the court may exercise personal jurisdiction over the defendant even in cases that do not arise out of and are not related to the defendant's forum contacts." *Hyatt Int'l*, 302 F.3d at 713. On the other hand, specific jurisdiction is more limited and exists for controversies that "arise out of" or "relate to" a defendant's forum contacts. *Id*. Plaintiff has not argued that the Court has general jurisdiction over Defendants, and therefore the Court undertakes only the specific jurisdiction inquiry.

A court may assert specific jurisdiction over an out-of-state defendant when the minimum contacts standard is met and the plaintiff's cause of action arises out of or relates to the defendant's contacts with the forum state. See, *e.g., Helicopteros,* 466 U.S. at 414. The defendant's contacts with the forum state must be of a nature and quality such that the defendant has fair warning that it could be required to defend a suit there. *Burger King Corp. v. Rudziewicz,* 471 U.S. 462, 472 (1985). This ensures that jurisdiction over a defendant is "not

based on fortuitous contacts, but on contacts that demonstrate a real relationship with the state with respect to the transaction at issue" and that "the defendant retains sufficient, albeit minimal, ability to structure its activities so that it can reasonably anticipate the jurisdictions in which it will be required to answer for its conduct." *Purdue Research Found.,* 338 F.3d at 780. "Notably, it must be the activity of the defendant that makes it amenable to jurisdiction, not the unilateral activity of the plaintiff or some other entity." *Id.*

**B.     Rule 12(b)(6)**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint, not the merits of the case. See *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a Rule 12(b)(6) motion to dismiss, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)). Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Svcs., Inc.,* 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly,* 550 U.S. at 555). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly,* 550 U.S. at 563. The Court accepts as true all of the well-pleaded facts alleged by the Plaintiff and all reasonable inference that can be drawn therefrom. See *Barnes v. Briley,* 420 F.3d 673, 677 (7th Cir. 2005).

### III.    Analysis

#### A.    Caesar and Hench Control II

##### 1.    Personal jurisdiction

Caesar argues that the Court does not have personal jurisdiction because "the facts conclusively establish that Caesar was neither a party to the contract agreement between Plaintiff and Hench [Control] I nor an assignee of that contract" [48 at 6].  Hench Control II similarly argues that it had no contract with Plaintiff [54 at 6].  Further, because those contacts that Caesar and Hench Control II had with Illinois were fleeting and unrelated to Dual-Temp, both say that dismissal for want of personal jurisdiction is appropriate.  In making the argument, both rely on an affidavit by their shared president, Alex Daneman; in the affidavit, Daneman states that Caesar purchased Hench Control I's assets (including accounts receivable) but not its liabilities (*i.e.*, contractual duties) [48-2 ("Daneman Aff."), at ¶¶ 14-15].  The Daneman Affidavit further intimates that the purchase order agreement between Hench Control I and Plaintiff was not assigned to Caesar.  *Id.* ¶ 15.

Despite Caesar's reliance on the role of its agreement to purchase Hench Control I's assets, Caesar does not cite that agreement, much less present the Court with reasoned argument about the agreement's meaning.  Likewise, and necessarily, Caesar has not referred the Court to any cases fixing the meaning of the asset purchase agreement's language.  The Court's own examination of the matter reveals that Plaintiff's case is hardly speculative.  The agreement between Caesar and Hench Control I includes an assignment of Hench Control I's "contract rights" [see 68-5 ("Asset Purchase Agreement"), at ¶ 3].  Although not without limitations, it is a general principle of contract law that an assignment of "contract rights" carries with it a delegation of contract duties, too.  See Restatement (Second) of Contracts § 328; *Wilson's*

*Heating & Air Conditioning v. Wells Fargo Bank*, 202 Cal. App. 3d 1326, 1334 (3d Dist. 1988); Cal. Civ. Code § 1589; *see also Pelz v. Streator Nat. Bank*, 496 N.E.2d (Ill. App. Ct. 1986) (citing with apparent approval Section 328 of the Second Restatement). Again, Caesar's motion to dismiss neither acknowledges nor engages the body of law on this subject. It merely cites the affidavit of its CEO, which offers a legal conclusion that is hardly self-evident. See also Asset Purchase Agreement, at ¶ 3 (referring to unattached appendices to the agreement and stating that the assets sale also includes "all other assets of the business including but not limited to accounts receivable, inventory, equipment, trade fixtures, leasehold improvements, contract rights, business records * * *, licenses, franchises, goodwill, websites, and URLs, covenants not to compete, intellectual property, and trade secrets, trademarks or service marks, trade names, telephone numbers, supplies, and Inventory [sic]."). Although the agreement disclaims liabilities generally, it also contains a "representation" by Hench Control I that "[a]ll leases and contracts being assigned and transferred hereunder are materially complete and in effect * * *." Asset Purchase Agreement ¶ 10(e).[3]

There is also considerable evidence that Caesar conducted business in Illinois by operating as Hench Control II, attempting to fulfill the contractual obligations of Hench Control I. Plaintiff's president points out [68-3 ("Weinstein Aff."), at ¶ 14] that Daneman stated in an e-mail that he visited the plant along with John Hench "early in the procedure." Weinstein Aff. Ex. A, at 2 (8/8/2007 e-mail).[4] There were other communications, too. Daneman corresponded

---

[3] Paragraph 10 includes an indemnification provision in the event that the representations are inaccurate, but the matter is not before the Court and would, of course, not affect personal jurisdiction.

[4] Daneman admits that he visited Home Run Inn with John Hench, but states that it was merely a stopover on the way to Canada and that he was merely accompanying John Hench. "While I was physically present, I did not actively participate in the meeting that John Hench had with Home Run Inn and Dual Temp." Daneman Aff. ¶ 13. Because Plaintiff need make out only a *prima facie* case of personal

with Plaintiff, Milord, and Home Run Inn numerous times to discuss what steps they had taken or were going to take in order to fix problems with the control system. See, *e.g.*, Daneman Aff. Ex. B (11/16/2007 e-mail); *id.* Ex. C (1/10/2008 letter); *id.* Ex. D (1/16/2008 e-mail). In the January 10, 2008 letter from Daneman to Milord, Daneman attached numerous "service summaries" indicating the work that had been done and which personnel performed work. In all, Daneman lists five "employees, agents, and representatives" that Caesar used in connection with Caesar's work at Home Run Inn [see 68-4 ("Defendants' Response to Plaintiff's First Set of Interrogatories"), at ¶ 2]. And the communications support the inference that Daneman believed that Hench Control II was operating under the original contract between Hench Control I and Plaintiff. In an e-mail from Alex Daneman to Dual-Temp, Hench wrote that Hench Control II would be billing for work that was "not on the spec and [later] became requirements." Weinstein Aff. Ex. B, at 1. The implication was that the company would *not* be billing for any work that was previously agreed to. That is an odd cross for a company gratuitously to bear.

Moreover, if Caesar was not operating under the contract that Dual-Temp says they were, then under what understanding where they operating? Caesar, at this early stage, offers no explanation. Sophisticated parties conducting transactions worth tens of thousands of dollars do not typically, so far as the Court is aware, interact so casually as to reserve for an unspecified future date the accounting (without any prior negotiation) of who owes what to whom. The closest to that understanding that one typically sees is the so-called "battle of the forms" situation created by UCC 2-207. But there is no intimation of such a battle here.

Caesar and Hench Control II tacitly concede that if they were bound by a contract with Dual-Temp, then the Court has personal jurisdiction over them. The concession, though only

---

jurisdiction, record disputes are resolved in favor of Plaintiff, and Daneman's e-mailed statement that he visited the Home Run Inn plant was made in the context of work that he had performed for the project.

implied, is sensible: in *Rudzewicz*, for instance it was enough that there was a contract that *anticipated* extensive future contact with the forum state. 471 U.S. at 480 (plaintiff "entered into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts * * *"). The only pre-litigation contacts with the forum state in that case had been introductory management courses and the purchase of $165,000 in equipment from the forum state. *Id.* at 466-67. The pre-litigation contacts here include a bid that was initiated by an agent for Hench Control II's (apparent) predecessor in interest, site visits by employees, a contract directed at a plant in Illinois, numerous instances of remote access by Hench Control II of that plant, and hundreds of thousands of dollars in damages growing out of that contract. See, *e.g.*, Weinstein Aff. ¶ 5 (describing the bidding process); *id.* ¶¶11, 14, 17 (site visits by Daneman and other employees or agents); *id.* ¶¶ 13, 15 (remote access capability and monitoring); Compl. ¶ 59 (more than $485,000 in consequential damages).

Still, the determination that Caesar and/or Hench Control II were not operating under a contract is not strictly necessary to decide the personal jurisdiction issue in this case. What matters is that the cause of action "arise out of or relate to the foreign corporation's activities in the forum State." *Helicopteros*, 466 U.S. at 414.[5] Thus, the existence of a contract is neither the *sine qua non* nor the silver bullet of the personal-jurisdiction analysis. Such "mechanical tests" have been rejected, and the Court instead has "emphasized the need for a highly realistic approach that recognizes that a contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences *which themselves are the real object of the business transaction*." *Rudzewicz*, 471 U.S. at 478-79 (emphasis added) (noting also that prior

---

[5] In *Helicopteros*, the Supreme Court declined to take up whether it is sufficient that a cause of action that merely "relate to" the defendant's contacts for purposes of personal jurisdiction, or whether there was any difference between "arise out of" and "relate to." 466 U.S. 408, 415 n.10 (1984).

negotiations and anticipated consequences do bear on the analysis). If Caesar engaged in the sufficient litigation-related minimum contacts to establish personal jurisdiction, it would not matter if those contacts were negotiated *ex ante*; what matters is that the activity was purposeful and that the cause of action arose out of that activity. And, unlike in *Rudzewicz* itself, the anticipated future consequences came to fruition. The legal determination about whether liability can be imposed for those consequences is conceptually distinct—if potentially overlapping (*Helicopteros*, 466 U.S. at 415 n.10)—from the question of whether Defendants purposefully availed themselves of the benefits of Illinois.

Therefore, even assuming *arguendo* the contract-based doubt that Caesar has failed to cast, there is sufficient evidence of activity related to the cause of action to make out a *prima facie* case of personal jurisdiction. Plaintiffs have pointed out, and documented, that Caesar bought the assets of Hench Control I and continued to work to fix the control unit. The continued efforts were undertaken by the CEO of Caesar and Hench Control II, during which time Hench Control II had not been incorporated. Caesar admits that "there were numerous telephonic communications between Caesar and Milord and/or Home Run Inn with respect to the refrigeration control system at issue." Plaintiff's First Set of Interrogatories ¶ 13. Daneman also represented to Plaintiff in an e-mail that because "we are in the 21st Century" and could remotely access the pertinent systems "[w]e are visually at your site, viewing the important stuff that we control" [68-6, at 4] and represented that they had accessed the system remotely so many times that they were not even billing for the minimal, brief visits. The e-mail contained a signature block that listed Daneman as the CEO of Hench Control II, not Caesar.

Defendants also—and despite Daneman's Hench Control II signature block—deny that Hench Control II was operating at all during the period from March 1, 2007, to January 28, 2008.

*Id.* ¶ 15.   Of course, if Hench Control II was not operating, then Caesar is the other plausible entity that was operating.   Indeed that is what Daneman, Caesar, and Hench Control II say: Daneman was acting "on behalf of [Caesar] *only*." [66 ("Responses to Request to Admit"), at ¶ 15 (emphasis added)].   But that denial does not help either Caesar or Hench Control II.   Given that the sale of Hench Control I's assets was to Caesar but that Hench Control II indicated that it was performing under the contract between Hench Control I and Plaintiff, that Daneman was the CEO of both firms, and that Daneman admits that Hench Control II was essentially just a shell entity with no employees (see Daneman Aff. ¶ 11), the evidence supports personal jurisdiction over both Caesar and Hench Control II.   The reason is that the evidence combined with Daneman's admission at least suggests that Caesar and Hench Control II failed to respect the corporate form.   That is, there is evidence that they were acting as a single entity.   See *Troyk v. Farmers Group, Inc.*, 90 Cal. Rptr. 3d 589, 619 (Cal. Ct. App. 2009) (listing the variety of factors that California courts consider in veil-piercing actions); *Laird v. Capital Cites/ABC, Inc.*, 80 Cal. Rptr. 2d 454, 463 (Cal. Ct. App. 1998) (veil piercing appropriate if "there is such a unity of interest and ownership between the two corporations that their separate personalities no longer exist[] and that an inequitable result will follow if the parent were not held liable"); *id.* at 462 (factors include the common ownership, common management, and disregard for corporate formalities, and shared office space).   Daneman himself provided sufficient evidence that the entities were acting as a single unit.   Critically, his affidavit states that, in effect, there is no Hench Control II: "it was formed solely to preserve the name 'Hench Control.'   Hench II has not had employees, it has made no sales, and it has generated no income."   Daneman Aff. ¶ 11.   Put simply then, there is evidence that the distinctness of the corporate entities was not respected, that there was common management, and that Hench Control II was undercapitalized.   This is

fertile ground for veil-piercing, at least at this stage.[6]  See also *Purdue Research Found.*, 338 F.3d at 788 n.17 (personal jurisdiction over parent appropriate where parent exercises an unusually high degree of control over subsidiary or otherwise shows that the subsidiary's "corporate existence is simply a formality" and the subsidiary is merely the agent of the parent); *Liberty Mut. Fire Ins. Co. v. Reimer*, 82 F. Supp. 2d 887, 890 (N.D. Ill. 2000) (personal jurisdiction over parent who "had to approve everything" when it came to subsidiary); 4A Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1069.4 at 175-84 (3d ed. 1998) (collecting cases in which personal jurisdiction was established over a non-resident defendant corporation "through subsidiaries, partnerships, alter egos, related and unrelated companies, successors-in-interest, companies acting as agents, and a number of other" veil-piercing contexts).

Overall, the character and quality of the contacts, which the Supreme Court says must be examined in every case, reveal that Caesar and Hench Control II's contacts with Illinois cannot be described as "so random, fortuitous, or attenuated that it cannot fairly be said that" they should not "reasonably [have] anticipate[d] being haled into court" in Illinois.  *Rudzewicz*, 471 U.S. at 486 (quotation marks omitted).  Because there is sufficient evidence that the two companies were acting as a single entity and that the conduct of one was the conduct of the other, there are sufficient minimum contacts for the Court to exercise personal jurisdiction over both.

Of course, minimum contacts is not the end of the analysis, for both defendants claim that (i) litigating in Illinois would be unduly burdensome and (ii) Illinois has no interest in the

---

[6] Plaintiff does not use the term veil-piercing but does argue, for example, that Caesar was "operating as Hench Control II" [68 at 8]. Therefore, it is appropriate for the Court to apply the correct law to Plaintiff's argument.  See, *e.g.*, *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 551 (7th Cir. 2001) ("Federal courts are entitled to apply the right body of law, whether the parties name it or not.").

litigation. As to the burdens, there is little that need be said. "When minimum contacts have been established, often the interest of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Asahi*, 480 U.S. at 115. Caesar has not made any meaningful argument that the burdens in this case will be particularly severe. There is no indication that the number of witnesses will be particularly large or that the process of discovery will be particularly complex due to the geography, much less that the process would be easier overall if the case were litigated elsewhere, all of which are factors that would bear on the analysis. *Interlease Aviation Investors II (Aloha) LLC v. Vanguard Airlines, Inc.*, 262 F. Supp. 2d 898, 909 (N.D. Ill. 2003) (citing *Logan Prods., Inc. v. Optibase, Inc.*, 103 F.3d 49, 53 (7th Cir. 1996)). Nor has either Defendant indicated where that elsewhere might be.

In short, there is no reason to believe that this case will be any different from the mine run of cases involving diverse parties; and once a plaintiff presents evidence of minimum contacts it becomes a defendant's job to show that traditional notions of fair play and substantial justice would be offended if the defendant were haled into the forum. *Rudzewicz*, 471 U.S. at 477 ("[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."); *id.* (noting that a defendant who claims substantial inconvenience "may seek a change of venue" and that most defendant considerations can be "accommodated through means short of finding jurisdiction unconstitutional"); *Asahi*, 480 U.S. at 116 (Brennan, J., concurring) (acknowledging that it would be a "rare case[]" for personal jurisdiction to be inappropriate where "the defendant has purposefully engaged in forum activities").

Likewise, and similarly without support, Caesar and Hench Control II argue that Illinois as a forum does not have an interest in the litigation. Although the interests of the forum state are part of the analysis (see *supra* Part II.A), Defendants fail correctly to frame the inquiry. According to them, Illinois has no interest in the litigation because it has no interest in Caesar or Hench Control II. But states plainly have an interest in enforcing commercial transactions as to which their citizens are parties. See, *e.g.*, *McGee*, 355 U.S. at 223 (California had a "manifest interest in providing effective means of redress for its residents when their insurers refuse to pay claims"); see also *Bolger v. Nautica Int'l, Inc.*, 861 N.E.2d 666, 672 (Ill. App. Ct. 2007) (due process requirements of personal jurisdiction in Illinois are satisfied when contract anticipates performance in Illinois, even where the contract is executed outside of Illinois). Caesar and Hench Control II's general rationale, unaccompanied by any showing of hardship, would in all cases prevent an Illinois-based court from exercising personal jurisdiction over a coastal defendant.

### 2.      Both 12(b)(6) motions are denied.

Caesar and Hench Control II argue that Plaintiff has failed to state a claim upon which relief can be granted because Plaintiff has failed to plead the elements of a breach of contract claim, and thus the respective breach of contract counts should be dismissed. That argument ignores the distinction between a fact-pleading jurisdiction and the notice-pleading regime of the Federal Rules of Civil Procedure. See, *e.g.*, *Veazey v. Commc'ns & Cable of Chicago, Inc.*, 194 F.3d 850, 854 (7th Cir. 1999). Because that was the only basis for dismissal urged by both defendants, their motions cannot be granted.

In any event, their arguments also overlook the text of Plaintiff's complaint, which alleges that Caesar was the real party in interest with regard to the contract (*i.e.*, the parties had a

contract) (Compl. ¶¶ 23, 77); that Plaintiff performed the contract (e.g., *id.* ¶ 25); Caesar failed to live up to its covenants (*e.g.*, *id.* ¶ 80), and that Plaintiff was damaged thereby (*id.* ¶¶ 82-85). Those *are* the elements of an Illinois breach of contract action. *Gallagher Corp v. Russ*, 721 N.E.2d 605, 611 (Ill. App. Ct. 1999). The complaint does the same thing with respect to Hench Control II, which is permissible because the Federal Rules of Civil Procedure allow for pleading in the alternative.

Finally, the Court notes that Hench Control II's motion also seeks the dismissal of Count VI of the complaint. After Hench Control II filed its motion to dismiss, Plaintiff voluntarily dismissed the count [see 74, 75]. Therefore, this portion of the motion is denied as moot.

### B.  Daneman's Motion is Granted for Want of Personal Jurisdiction

The Court lacks personal jurisdiction over Daneman. Once a defendant raises the issue of personal jurisdiction, it is the plaintiff's burden to make out a *prima facie* case that the Court has personal jurisdiction. See, *e.g.*, *Steel Warehouse of Wisconsin, Inc. v. Leach*, 154 F.3d 712, 715 (7th Cir. 1998). Although Daneman's brief makes many of the same (rejected) arguments as Caesar and Hench Control II, Daneman further argues that the fiduciary-shield doctrine deprives the Court of personal jurisdiction. The fiduciary-shield doctrine is a state law creature that applies only in diversity cases. *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001) (noting the font of authority for the doctrine and concluding that it would be "unsound" for federal courts to adopt the doctrine in federal cases as a matter of federal common law). The fiduciary-shield doctrine "denies personal jurisdiction over an individual whose presence and activity in the state in which the suit is brought were solely on behalf of his employer or other principal." *Rice v. Nova Biomed. Corp.*, 38 F.3d 909, 912 (7th Cir. 1994). As such, and although much criticized (*id.*), the doctrine "makes it easier for businesses to hire

agents, who need not fear that they put their personal wealth at stake in every jurisdiction that they visit on the firm's behalf" (*Hardin Roller Corp. v. Universal Printing Mach., Inc.*, 236 F.3d 839, 842 (7th Cir. 2001)). Illinois courts recognize the doctrine. See, *e.g.*, *Femal v. Square D Co.*, 903 N.E.2d 32, 37 (Ill. App. Ct. 2009) ("Illinois courts lack jurisdiction over an employee or agent who comes under the protection of Illinois law to serve the interests of his employer or principal, and not to serve his personal interest."); *People ex rel. Hartigan v. Kennedy*, 576 N.E.2d 107, 114-15 (Ill. App. Ct. 1991).

Daneman's brief argues that the travel and correspondence by Daneman were "performed strictly in his capacity as a representative of Caesar" [51, at 10]. The record evidence jibes with his argument. In the e-mails that have been presented with the parties' filings, Daneman indicates that he is acting on behalf of Hench Control II. See also Weinstein Aff. ¶ 12. Other items from the jurisdictional discovery indicate that Daneman was acting on behalf of Caesar. There is, however, no indication that Daneman was acting for personal gain distinct from his companies' fortunes. *Brujis v. Shaw*, 876 F. Supp. 975 (N.D. Ill. 1995) (observing that Illinois courts "refuse to apply the doctrine when the defendant is the alter ego of the entity for which he is a fiduciary"); *cf.* also *Hardin Roller Corp*, 236 F.3d at 842; *Rice*, 38 F.3d at 912 (observing that, to escape the doctrine, the personal gain probably need not be pecuniary but indicating that it must be "purely personal").

Critically, Plaintiff has not responded to Daneman's fiduciary-shield-doctrine arguments. And given that Illinois courts apply the doctrine in determining personal jurisdiction, the omission is fatal. Because the Court grants Daneman's motion to dismiss for lack of personal jurisdiction, the Court does not take up Daneman's motion to dismiss on the merits. *Marathon Oil*, 526 U.S. at 577 (court lacks jurisdiction over merits where a court lacks either subject-

matter jurisdiction or personal jurisdiction). Those merits will have to be determined, if at all, in another court.

**V.        Conclusion**

For the reasons stated above, Caesar's motion to dismiss [46] and Hench Control II's motion to dismiss [52] are denied. Daneman's motion to dismiss [49] is granted.


Dated:  December 4, 2009

_____
Robert M. Dow, Jr.
United States District Judge