# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DUAL-TEMP OF ILLINOIS, INC., an Illinois Corporation<br>   Plaintiff,<br><br>v.<br><br>HENCH CONTROL CORPORATION, a California Corporation, HENCH CONTROL, INC., a California Corporation, CAESAR-VERONA, INC., a Washington Corporation, and JOHN HENCH, an Individual,<br>   Defendants. | 09-cv-595<br><br>Judge Sharon Johnson Coleman |

## MEMORANDUM OPINION AND ORDER

  Plaintiff, Dual-Temp of Illinois, Inc. ("Dual Temp"), filed this action against defendants Hench Control Corporation, Hench Control, Inc., and Caesar-Verona, Inc. asserting a claim for breach of contract against each.[1] This Court held a bench trial from January 7-10, 2014. Following the bench trial, each party submitted deposition designations and filed post-trial briefs with proposed findings of facts and conclusions of law. The following constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## BACKGROUND & BENCH TRIAL PROCEEDINGS

  Dual Temp is a refrigeration contractor that designs, installs and repairs low temperature ammonia refrigeration systems. In 1992, Dual Temp designed and built the refrigeration system for Home Run Inn's pizza manufacturing facility in Woodridge, Illinois. In 2006, Home Run Inn began an expansion project and hired Milord Company ("Milord") as general contractor. Milord subcontracted with Dual Temp to modify and install a refrigeration system. Dual Temp subsequently solicited bids from several companies, including Hench Control Corporation ("Hench I"), to design a refrigeration control system to be integrated into the refrigeration system

---

[1] The Court previously granted summary judgment in defendant John Hench's favor on Count IV (breach of contract), and in favor of John Hench and Hench Control Corporation on Count V (breach of implied warranty of fitness).

at the Home Run Inn facility. At the time, Hench I was a California corporation owned and operated by John Hench.

In response to Dual Temp soliciting bids for the Home Run Inn project, Hench I's Chicago area agent, Ron Ariano, faxed a 14 page questionnaire to John Hench on October 11, 2006, stating:

> "Dual Temp is looking for a new control system for a project called Home Run Inn Pizza here in the Chicago area. There are three existing M&M compressors, they want to get rid of the panels from these compressors and install a whole new system. I am also quoting them one new high stage Mycom compressor and a new booster to go along with the three M&M Machines. I am attaching all the information from Dual Temp." (Pl.'s Tr. Ex. 155, p. 1.)

Ariano was allegedly told the new Hench system was to "mimic the [old] M&M system with the addition of the new refrigeration evaporators and compressors." (Tr. 68: 5-11.) Ariano testified that when he offered to provide an M&M manual, John Hench said he did not need it. (Ariano Dep. 40:6-41:6.) The parties dispute whether the faxed questionnaire constitutes a "spec sheet" but agree that John Hench based his proposal on the information provided.

On October 11 and 17, Ariano submitted proposals to supply a control system to Dual Temp for $45,078.00, guaranteeing the system would be "completely tested in our facility before shipment." (Pl.'s Tr. Ex. 152, p. 1, 154, p.1.) Dual Temp subsequently issued a purchase order on October 20, which included "General Terms and Conditions" on the backside. (Pl.'s Tr. Ex. 247.) Hench I subsequently issued a kick-off letter on October 23, 2006. (Pl.'s Tr. Ex. 153.)

On February 28, 2007, Caesar-Verona, Inc. ("Caesar Verona"), which is owned and operated by Alex Daneman, acquired Hench I through a sale of assets. (CV's Tr. Ex. 6.) Casear Verona, doing business as Hench Control, Inc. ("Hench II"), continued to operate under the Hench name. Pursuant to the purchase agreement, John Hench provided training and general support for two years at varying hourly minimums and wages. (*Id*. at ¶17.) Daneman testified that Hench II is a holding company for the Hench name. (Daneman Dep. 133: 21-134:6.) Hench I was voluntarily dissolved on July 9, 2007. (Dkt. #266, Pl.'s Tr. Br., Ex. A.) No evidence was presented to dispute that Dual Temp no notice or knowledge of the acquisition or later dissolution of Hench I.

The Hench system was shipped to Dual Temp beginning in January 2007 and later installed by Dual Temp's subsidiary, Spur Electric, Inc. Dual Temp made two payments in December 2006 and March 2007, totaling $40,570.00. Dual Temp alleges the system was

shipped without being factory tested. Defendants dispute this fact but admit, however, that the system was shipped with the wrong software and wiring diagrams and that corrected software and diagrams were promptly furnished to Dual Temp.

Dual Temp asserts problems arose with the Hench system immediately upon installation, continued past start-up and that the system never properly worked at the Home Run Inn facility. (*See e.g*. Halverson Dep. 59:17-66:6, 70:9-73:8, 85:18-93:7; Milord Dep. 56:15-59:24, 88:1-19; Bures Dep. 55:12-57:16.)  The Hench system experienced communication losses that would occur, at times, several times per day. (*Id*.; Dkt. #266, Ex. B.) This problem persisted for more than nine months. Throughout this time, Daneman, John Hench, defendants' programmers and technicians, Dual Temp technicians and Spur Electric's electricians visited the site in order to diagnose and fix the problem. Several individuals monitored the Hench system, including Wayne Sorenson (a Dual Temp service technician), Rich Gordon (vice president of Spur Electric), and defendants' employees. Daneman ultimately issued several invoices to Dual Temp for troubleshooting costs, which he also sent to Milord directly. (Pl.'s Tr. Ex. 19; 183.)

In December 2007, Caesar Verona hired Jayson Deslauriers and Sean Farren, two independent technicians, to determine the cause of the continuing communication loss at Home Run Inn and prepare a report. Deslauriers' report suggested a faulty humidistat, not the Hench system, was at fault. (*See* Pl.'s Tr. Ex. 183.) Milord also independent contracted with AMS Mechanical Systems, Inc. to review, troubleshoot and provide a report of its findings and recommendations. (Pl.'s Tr. Ex. 28.) AMS concluded that "the communication failures has something to do with Color Master. It is either a problem with the software itself or a problem with receiving the data from controller #1 to Color Master." (*Id*. at D-T000431). Color Master is a component of the Hench system.

In May 2008, Home Run Inn instructed Dual Temp to remove the Hench system. Dual Temp was then required to, and did, retain another subcontractor, Select Technologies, Inc. to remove and replace the system for $113,500.00. Eric Staley, president of Select Technologies was designated as Dual Temp's expert at trial but ultimately not tendered as an expert. Staley testified he removed the Hench system in order to replace it with his own, but other than being generally aware of the fact that it experienced communication losses he had no contact with the Hench system. (Tr. 160:11-18; 162:13-163:3.) Dual Temp asserts the new Select Technologies system has been operating without communication failures since installation.

3

At trial, defendants tendered Ron Vallort as an expert in the area of refrigeration control. (Tr. 441:20-23.) In advance of trial, Vallort prepared a written report which states that the communication failures "could have been caused by factors other than a defect in the system itself," such as power surges and voltage drops, a short within the control system caused by a faulty ammonia or humidity sensor, design flaws in the refrigeration system, faulty wiring, improper installation, and continual additions and modifications. (Pl's Tr. Ex. 250, pp. 1-7.) Vallort opined that "the cause or causes of the communication failures cannot be determined within a reasonable degree of certainty. (*Id.* at p. 7.) Vallort testified to the above conclusions and that he reviewed several documents, including the AMS report and Deslauriers' report, as well as deposition testimony in order to prepare his report and reach his conclusions. (*See generally*, Tr. 440:15-502:13.)

With respect to Dual Temp's asserted breach of contract claims against Hench I, Hench II and Caesar Verona, this Court previously denied all cross motions for summary judgment finding there were issues of fact as to whether Hench I breached its contract with Dual Temp, and whether Hench II implicitly assumed Hench I's liabilities on the Dual Temp contract. (Dkt. #234, Memorandum Opinion and Order.) Dual Temp now seeks to recover damages of $790,580.08 plus interest and attorneys' fees.

## DISCUSSION

The parties do not dispute that a valid contract existed between Dual Temp and Hench I. However, Caesar Verona vigorously disputes that it ever implicitly assumed liability for the Dual Temp contract following the sale of assets. All parties dispute whether a breach occurred and, if so, whether the requested damages are reasonable.

*Purchase Agreement*

The Court previously ruled that Caesar Verona did not expressly assume Hench I's liability when it acquired Hench I's assets. (Dkt. #234 at p. 10.) Indeed, the general rule of successor liability under California law, which governs the purchase agreement, is that a corporation that purchases all of the assets of another corporation is not liable for the former corporation's liabilities unless, among other theories, there is an express or implied agreement of assumption. *Cleveland v. Johnson*, 209 Cal. App. 4th 1315, 1326-27 (2012), review denied (Jan. 23, 2013). The Court now finds that Caesar Verona implicitly assumed liabilities on the Dual Temp contract. In so holding, the Court considers several factors, most significantly the conduct

of the parties. *See Truck Ins. Exchange v. Amoco Corp.*, 35 Cal. App. 4th 814, 826-827 (Cal. App. 2d Dist. 1995).

Following the sale of assets, Caesar Verona, doing business as Hench II, shipped the correct software and wiring diagrams, dispatched technicians to the Home Run Inn facility early on to assist with installation, and shipped a new computer to Dual Temp in August 2007. Daneman also attempted to begin the warranty period on the Hench system in January 2008 and ultimately billed Dual Temp more than $52,000 for the final 10% due plus costs incurred to troubleshoot the various problems.

Even after the sale of assets, the Court finds Dual Temp reasonably believed it was still dealing with Hench I. Aside from issuing a press release, neither Hench I nor Caesar Verona notified any customers of the sale. Daneman and John Hench visited the Home Run Inn together at least once at which time Daneman was introduced as "the new owner of Hench Controls." (Hench Dep. 60:2-9.) From that time forward, Daneman was included on and sent a multitude of emails to Dual Temp, Milord and Home Run Inn regarding the recurring communications problems. Daneman continued to use Hench I's logo and letterhead, retained Hench I's programmers and technicians and contracted to keep John Hench on as a consultant for two years following the sale. Daneman testified that he had a responsibility to maintain and protect the goodwill of the Hench name and business and that his actions manifested his intention to do so but nothing more. The Court does not question Daneman's true intention to ameliorate a situation set in motion by his predecessor but in this circumstance finds that Daneman's actions implicitly assumed liability for the Dual Temp contract.

Caesar Verona argues that – to the extent that any contractual relationship arose or otherwise existed between Dual Temp and Caesar Verona – Dual Temp explicitly disclaimed any such right. In a letter to Daneman dated April 2, 2008, Weinstein wrote:

> The time has come to terminate your unauthorized interference into the contracts between Dual Temp of Illinois, Inc. and Milord Company and Dual Temp and Home Run Inn. I thought I made it clear to you that there is no contractual relationship between Dual Temp of Illinois and Hench Control Inc. In fact, I am not certain that Hench Control Inc. is an existing corporation.
>
> If Hench Control, Inc. has any relationship to the HRI project, it arises from some sort of assignment by Hench Control Corporation, the original subcontractor to Dual Temp for this project. Until our counsel conducted a recent corporation search in anticipation of possible legal action, Dual Temp had no knowledge and was never notified that Hench Control Corporation had disposed of its assets or

otherwise disposed of its business, including any assignment of its subcontract obligations owing Dual Temp.

We have notified John Hench of his obligations regarding the completion of the subcontract entered into between Hench Control Corporation and Dual Temp of Illinois, Inc. If John Hench, as the survivor of Hench Control Corporation, has assigned its subcontract for the HRI project to Hench Control, Inc. or any other entity, Dual Temp will not accept such assignment unless all the terms of the agreement are disclosed and unless Dual Temp and the assignee can come to a reasonable definition of the work to be performed.

In any case, you are hereby notified that you unauthorized actions have caused a detrimental inference in the contracts between Dual Temp and Milord and Dual Temp and Home Run Inn. Dual Temp will hold you liable for the damages caused by such interference and, by this notice, demands that you cease and desist all further unauthorized communications with Milord and Home Run Inn. (CV's Tr. Ex. 8.)[2]

The Court declines to adopt Caesar Verona's position. Hench I did not assign the Dual Temp contract to Hench II or Caesar Verona. Therefore, any relinquishment, disclaimer or waiver of such an assignment by Dual Temp is without force. In Illinois, "[w]aiver applies in situations in which a party intentionally relinquishes a known right." *Anderson v. Catholic Bishop of Chicago*, 759 F.3d 645, 651 (7th Cir. 2014). As stated several times, and the letter makes clear: Dual Temp had no knowledge of the relationship between Hench I and Hench II, or even Hench II's corporate status, let alone Caesar Verona's involvement in the matter. Moreover, the letter was sent contemporaneously with the decision to replace the Hench system, after all efforts to troubleshoot and resolve the persistent communication losses had failed and significant damages incurred. For all these reasons, the Court finds Caesar Verona implicitly assumed Hench I's liabilities with respect to the Dual Temp contract.

---

[2] Dual Temp also sent a letter to Hench I on April 2, 2008, which states in relevant part:

"[L]ate in 2007, we learned that Hench Control Corporation had sold its business to a third party. Until we independently discovered this fact, Dual Temp was never notified of the transfer of Hench's obligations to any other entity. Dual Temp has no idea as to the relationship between the seller and the purchaser with regard to the warranty of the control system provided by Hench to HRI.

As the new entity used the name "Hench Control, Inc." and its stationary contained only the phrase "Hench Control" the distinction was not recognized. As far as Dual Temp is concerned, Hench Control Corporation had the sole liability to provide and warrant a control system that satisfies the needs of HRI. Inasmuch as Hench Control Corporation was liquidated and its assets were distributed to its shareholders, Dual Temp will hold the shareholders of Hench Control Corporation personally liable for the costs Dual Temp must incur to repair or replace the system. If, in fact, you have passed this liability to another entity, it is up to you to either cause you assignee to fulfill your obligations at no cost to Dual Temp or to otherwise recover your damages from them." (CV's Tr. Ex. 8.)

*Breach of Contract*

In denying cross motions for summary judgment, the Court found that a genuine issue of material fact existed as to whether a breach occurred. (Dkt. #234.) To prevail on its breach of contract claim Dual Temp, must demonstrate: "(1) the existence of a valid and enforceable contract; (2) substantial performance on its part; (3) a breach by [defendants]; and (4) resultant damages." *U.S. ex rel. Pileco, Inc. v. Slurry Sys., Inc.*, 872 F. Supp. 2d 710, 717 (N.D. Ill. 2012). "The party who seeks damages has the burden not only to establish that [it] sustained damages, but also to establish a reasonable basis for computation of those damages. Damages may not be awarded on the basis of speculation and conjecture." *Perfection Corp. v. Lochinvar Corp.*, 349 Ill. App. 3d 738, 744 (2004).

The Court heard extensive testimony regarding what may have caused the communication losses with the Hench system. Dual Temp contends that defendants breached the contract by tendering non-conforming goods and asserts defendants' failures to properly factory test the system prior to shipment and manufacture a system that was never able to adequately maintain stable communications at the Home Run Inn facility constitute breaches of contract. Dual Temp maintains that defendants were on notice of the communication problems within a month of installation and that Dual Temp rightfully rejected the non-conforming goods within a reasonable time. *See* 810 ILCS 5/2-602(1).

Caesar Verona argues Dual Temp has failed to prove that the communication losses at Home Run Inn were caused by the Hench control system or otherwise link the communications problems with any alleged failure to factory test the system or a patent or latent defect within the system itself. Caesar Verona contends Dual Temp improperly seeks to prove its contract claim by applying principles of *res ipsa loquitur*.

Dual Temp asserts that it was not required to prove that a *defect* in the Hench system caused the communication failures. In support of this argument, Dual Temp cites to *Arcor, Inc., v. Textron, Inc.*, 960 F.2d 710 (7th Cir. 1992). The plaintiff in *Arcor* contracted with defendants for a small-hole-drilling electrical discharge machine. *Id*. at 711. After two years and more than thirty service calls, plaintiff sued for breach of warranty alleging the machine did not work properly and failed to meet certain contract specifications. *Id*. A jury returned a verdict for plaintiff and the Seventh Circuit, on appeal, affirmed the trial court's denial of defendants' motion for judgment notwithstanding the verdict or a new trial. *Id*. Defendants argued that they

were entitled to judgment notwithstanding the verdict because plaintiff did not prove that the machine's failure to perform according to the contract specifications was caused by a defect in the machine rather than by plaintiff's misuse, an argument the Seventh Circuit rejected. *Id*. at 714. This case is distinguishable on its face, however, as the plaintiff's claim was for breach of warranty and the standard of review required the Seventh Circuit to "ask whether all the evidence, viewed in a light most favorable to the [non-movant], so overwhelmingly favors the movant, that no contrary verdict could ever stand." *Id*.

Caesar Verona argues it put forward an equally plausible explanation for the communication losses – namely Vallort's expert testimony that several external factors, including power surges, voltage drops, faulty wiring and improper installation by Spur Electric, could have damaged the Hench system or caused the communication problems at the Home Run Inn facility. Caesar Verona urges the Court to necessarily find Dual Temp failed to prove its claim.

In an attempt to discredit defendants' expert, Dual Temp calls into question Vallort's state of mind and instinctual rigor by pointing out that Vallort's report contained errors, as well as Vallort's deposition and trial testimony that he was on pain medication and recovering from surgery while preparing his report. (Dkt. #266, pp. 11-12.) The Court finds this argument unavailing.

Finally, Hench I argues that the terms and conditions of Dual Temp's purchase order relieve it of any liability. The terms of the purchase order required Hench I to manufacture a refrigeration control system that met Dual Temp's plans and specifications. (See Pl.'s Tr. Ex. 247, p. 2.) Hench I argues that defendants ultimately provided a system that had every feature Dual Temp required. (Dkt. #268, Hench I Tr. Br. p. 5.) Hench I contends Weinstein admitted that the Hench system ultimately included every feature Dual Temp, Milord and Home Run Inn required and that the problem was not a failure to meet specifications but that the communication feature had failed. (*Id*. (*citing* Tr. 392:25-292:15).) The Hench system was never accepted and thus Hench I argues judgment must be entered in defendants' favor.

Dual Temp's October 20 purchase order accepting Hench I's proposal included "General Terms and Conditions," which provided:[3]

> All material and equipment furnished under this order for a specific project shall be subject to the approval of the architect, engineer, or any other designated party, and Seller shall furnish the required number of submittal data or samples for said approval. <u>In the event approval is not obtained, the order shall be canceled, with no liability on the part of either Purchaser or Seller, unless the order is placed with the understanding that the material and/or equipment is to be supplied of the type and in such manner as to meet requirements of plans and specifications. In the latter case, Seller shall comply without further cost to Purchaser.</u>
>
> Seller shall guarantee work covered under this purchase order to produce capacities or meet design specifications and function (1) as called for in the plans, specifications or addenda, (2) as herein set forth, and (3) as published or warranted by the manufacturer for the equipment involved. <u>In the event that the Seller's goods, materials, equipment, labor or work does not meet the foregoing requirements, Seller shall immediately, upon notice, replace or repair same or remedy any deficiency without expense to Purchaser.</u> In the event of Seller's default hereunder, Seller shall pay all special, indirect, incidental or consequential damages incurred by Purchaser, including but not limited to, Purchaser's attorneys' fees, court costs, expert or opinion witness fees and interest accruing at the rate of 1½ % per month accruing from date or notice of demand. Seller shall indemnify and hold Purchaser harmless from any and all claims made against Purchaser arising from defects in the goods, material, equipment, labor or work supplied by Seller. (Pl.'s Tr. Ex. 247, p. 2 (emphasis added).)

The Court finds that the Hench system never met Dual Temp's (or Milord's or Home Run Inn's) requirements. Defendants insist that Dual Temp must prove that the communication losses were a product or result of a defect in the Hench system. However, this position overlooks the clear and unambiguous terms of the contract itself: defendants not only contracted to supply a system "to meet requirements of plan and specifications" and also guaranteed that their work would "produce capacities or meet design specifications and functions." The Hench system did not meet the requirements, and as such, defendants were required to replace, repair or remedy any deficiency without expense to Dual Temp. As such, the Court finds defendants are in breach.

*Damages*

Dual Temp asserts it is entitled to recover incidental and consequential damages, including $302,594.89 for time spent by Dual Temp and Spur Electric employees monitoring and

---

[3] Hench I's October 11 proposal included a one year warranty from date of delivery. The purchase order's terms and conditions provided a one-year warranty from date of acceptance, which eliminated Hench I's warranty provision. *See* 810 ILCS 5/2/207(2).

9

troubleshooting the system, $113,500.00 for a replacement system per statute. *See* 810 USC 5/2-715. Dual Temp also asserts it is entitled to recover interest, for a total of $790,580.08. (Dkt. #266, Pl.'s Tr. Br. p. 24, Ex. C; Pl.'s Tr. Ex. 247, p. 2.) The terms of the purchase order also provide Dual Temp is allowed to recover attorneys' fees. (Pl.'s Tr. Ex. 247, p. 2.)

The Court denies Dual Temp's request for any costs associated with monitoring or troubleshooting as it has failed to prove by a preponderance of the evidence that it suffered any such damages and further failed to provide "a reasonable basis for computation of those damages." *Perfection Corp.*, 349 Ill.App.3d at 812. Indeed, the purpose of damages is to place the non-breaching party in a position that he or she would have been in had the contract been performed, not to provide the non-breaching party with a windfall recovery. *Jones v. Hryn Development, Inc.*, 334 Ill.App.3d 413, 418 (1st Dist. 2002). Nothing presented at trial or in post-trial briefs suggests that Dual Temp actually incurred any monitoring and troubleshooting costs, neither employee tasked with monitoring the system kept time records of their activities, nor were the time summaries presented to this Court to prove monitoring damages were in any way created contemporaneously with the monitoring work actually performed. (See Dkt. #266, pp. 10-12; Dkt. #267, CV Tr. Br. pp. 7-9; Dkt. #268, pp. 13-15.)

Dual Temp is awarded $113,500.00 for the cost of the replacement system, interest and attorneys' fees.

## CONCLUSION

The Court finds in favor of Dual-Temp of Illinois, Inc. and against Hench Control Corporation, Caesar-Verona, Inc., and Hench Control, Inc. The Court holds defendants jointly and severally liable in the amount of $113,500.00 plus interest accruing and attorneys' fees.
IT IS SO ORDERED.

Date: September 30, 2014

United States District Judge